Dye, J. (dissenting).
On September 3, 1951 the claimant’s intestate, George Flores, a professional fighter, died from injuries he received in a prize fight held in Madison Square Garden on August 29, 1951. His administrator, the appellant herein, filed this claim for wrongful death against the State of New York alleging that the State, acting through its duly authorized agency, the State Athletic Commission and its Medical Advisory Board (L. 1920, eh. 912, as amd.), was negligent in issuing its *414 license for the fight in question. The negligence claimed is based on the circumstance that, prior to the fatal fight and on July 24, 1951 and on August 14, 1951, the decedent had participated in two boxing matches in each of which he suffered a technical knockout (TKO); that, because of these prior beatings, he was rendered so physically unfit as to make it unsafe and improper for him to engage in the match in question, all of which was known to the examining physician, and that to license him to fight under such known circumstances subjected him to a serious and unwarranted risk.
Following a long trial the Court of Claims (Youttg, J.) made an award in favor of claimant in the sum of $80,000, it having found that the negligence of the examining physician was attributable to the State and rendered the State liable in the premises; that the decedent did not assume the risk of the State’s negligence and was not contributorily negligent.
The Appellate Division reversed the judgment entered on the award and dismissed the claim on the general ground that, even though it be assumed that the examining physician was an employee of the State (which it doubted), the issuance of the license under the circumstances was no more than an error of judgment on the part of the examining physician for which the State is not liable (St. George v. State of New York, 283 App. Div. 245, affd. 308 N. Y. 681).
In New York, all prize fights and boxing exhibitions are illegal except those authorized by the so-called Walker Boxing Law (L. 1920, ch. 912, as amd.). The purpose prompting such legislation was “ to prevent as far as possible certain brutal and degrading features which have in the past sometimes attended such contests, and, second, to promote and protect such contests when conducted within the legitimate limits of a sport.” (Fitzsimmons v. New York State Athletic Comm., 15 Misc 2d 831 [Seabury, J.].) To achieve these worthy purposes, the Legislature created the State Athletic Commission with power to promulgate stringent rules governing the conditions under which fights can be held and gave exclusive control of every phase of the sport, including its personnel, through a system of bonding, licensing and penalties. A license to fight or conduct a fight is a privilege and not a right (Matter of London Sporting Club v. Helfand, 3 Misc 2d 431; Matter of Christensen v. Helfand, *415 208 Misc. 302). By express provision of law, licenses may "be withheld by the commission whenever the participants fail to meet certain standards as to character and general fitness (§ 12, as added by L. 1952, ch. 666, § 11). To make sure that the fighters participating in boxing matches are physically fit, and for the purpose of safeguarding their physical welfare, a Medical Advisory Board has been created consisting of nine licensed physicians of at least five years’ experience in practice, appointed by the Governor, whose duty it is, among others: ‘ ‘ to prepare and submit to the commission for approval regulations and standards for the physical examination of professional boxers and wrestlers. The board shall continue to serve in an advisory capacity to the commission and from time to time prepare and submit to the commission for approval, such additional regulations and standards of examination as in their judgment will safeguard the physical welfare of professional boxers and wrestlers licensed by the commission. The advisory board shall recommend to the commission from time to time such qualified physicians, for the purpose of conducting physical examinations of professional boxers and wrestlers, and other services as the rules of the commission shall provide; and shall recommend to the commission a schedule of fees to be paid to physicians for such examinations and other services as required by this act.” (§4, subd. 2, as amd. by L. 1952, ch. 666, § 4.)
Pursuant to such authorization, the Medical Board recommended to the commission a list of qualified physicians for the purpose of conducting physical examinations of boxers and wrestlers. It is from this panel that the names of the physicians who made the several examinations of the decedent Flores were selected. While, ostensibly, the corporation had a choice, in practice, it worked out that the examinations were invariably made by the same physicians. In this instance, Dr. Vincent Nardiello, a licensed physician, had been on the panel since 1932, from 1934 had received most of the Madison Square Garden assignments and, since the death of Dr. Walker, had received most of the assignments for the Madison Square Garden and the St. Nicholas Arena. A routine pattern is followed: The main bout fighters are examined five days before a fight, again on the night of the fight and the physician attends all fights and, on occasion, examines a fighter afterwards. Under such a *416 restricted set-up, both as to duties involved and the limitations on the personnel charged with the performance of such duties, it seems obvious that the State retained such a close and exclusive direction and control over the physical examinations of the boxers and the physicians who made the examinations as to render the State liable for the negligent performance of the duties imposed. Nothing turns on the circumstance that the physician’s examining fee was paid by the corporation. That is not enough to relieve the State of the responsibility incident to control. The amount of the fee, we must remember, is also fixed by the regulation and seems to be treated as a cost of doing business rather than a measure of the value of the service rendered (Bules and Regulations of State Athletic Comm., former § 41 [N. Y. Off. Comp, of Codes, Rules & Regulations, Yol. 2, p. 1220]). Neither the corporation nor the boxer had any choice in the matter. Neither could select a physician of his own choice. The examination was not made at the request of either, but by direction of the commission, the members of iwhich relied on the report in determining whether to allow or ¡forbid the fight. Such a situation falls within the well-estabfished proposition that the true test of the relationship of master and servant is not who pays the wages but whether, at the time pf the injury complained of, the alleged servant is engaged in the business of the master and subject to his direction and ¡control (Baldwin v. Abraham, 57 App. Div. 67, affd. 171 N. Y. 1677; Bartolomeo v. Bennett Contr. Co., 245 N. Y. 66; Callahan v. Munson S. S. Line, 141 App. Div. 791).
So viewed, the Court of Claims correctly found as matter of fact and law that the designated examining physicians for purposes of the examination were employees of the State.
I now turn to the issue of negligence. The Court of Claims has found as a fact that, in permitting Flores to fight, the doctors were negligent. All of the medical witnesses agreed that possibility of injury to the brain, such as a concussion, had always to be considered and good medical practice requires that persons who had received a severe beating in and about the head should be kept quiet for a period of from six to eight weeks, and that this was dictated even in the absence of objective neurological signs of head injury.
*417 On August 29,1951 Dr. Nardiello examined Flores along with nine other contestants on that evening’s fight card. The examination of Flores took 10 to 15 minutes, consisting in part of the answers made by Flores to a written questionaire which he signed and a complete physical examination by the physician. Dr. Nardiello testified in substance that when he interviewed Flores and was told by him that he had lost his last two fights by TKO, he said to him: “ ‘ What are you fighting for? ’ Then I went inside to get the records.” He considered the records important “because of the TKO, I figured he should have a rest ”. It was his experience that “ if a man gets a bad beating around the head or is knocked out, to take a rest for two months and have EEG- taken; that’s the electroencephalogram.”
The records of the previous fights were available. At the Flores-Cerky fight on July 24, 1951 at Fort Hamilton Arena, Flores had been examined by Dr. Swetnick, panel doctor; during the second round Cerky had hit Flores a series of hard blows to the face knocking out his mouthpiece and reducing Flores to a “ helpless ” or “ lifeless ” state, causing the referee to stop the fight by a TKO ruling. Three weeks later, on August 14, Flores fought Roger Donoghue at White Plains. At that time he was examined by Dr. Bockner, a panelist, who made the usual routine physical checkup and reported that his physical condition was good and that it was permissible for him to fight that night. It was a hard fight. Donoghue was a tough fighter described as a “ turned-around southpaw ” with a powerful left hook. Flores was somewhat shorter by about four inches. In the eighth round Donoghue landed a blow to the head that caused Flores to stagger. Donoghue knew he “ had him ” and followed with a series of fast blows. Flores was on the ropes. He collapsed and the referee stopped the fight, declaring Donoghue the winner by a TKO. Flores revived and left the ring. He was described as “ groggy ”. Dr. Bockner was present from the'beginning of the fight and after the TKO he went to Flores’ corner, asked him how he felt and examined his eyes. About 20 minutes later, he again examined him in the dressing room and found his pressure, heart, hands and reflexes normal and that, in his opinion, he had suffered no concussion and he so reported to the commission.
*418 On the following day Flores’ manager asked the Deputy State Athletic Commissioner, Duberstein, for a rematch with Donoghue. Duberstein then talked with Dr. Bockner on the telephone, following which he advised Duberstein that Flores could not fight until he had had an BEG taken. An EEG was taken on August 16, a report of which is in the file and contains the comment: “ This is a generally good record. However, there is some slowing anteriorly. Impression normal record ”. Upon receipt of this report, Duberstein lifted the suspension and advised his manager that they could go ahead with the rematch which was then set for August 29th. The Flores-Donoghue rematch started at about 9:30 p.m. The fighters were about evenly matched, although it looked as though Donoghue would win on points. In the fatal eighth round, Donoghue landed a right-hand punch to the mouth, followed by a left hook to the chin, which Donoghue described: “ I nailed him perfectly ”. In falling, Flores hit the floor “ buttocks first before the shoulders; then the shoulders; then his head ”. Flores took the count but revived and walked to the dressing room. There, he went into a deep coma from which he never regained consciousness. He was rushed to a hospital for an emergency operation. It was unsuccessful. Flores died three days later (September 3). In describing the operation, Dr. Daniels, a well-known neurosurgeon, said he found no massive hemorrhage, which ruled out the possibility that a single blow had caused the final injury. There was, however, a small hemorrhage underneath the dura mater, which is described as the outermost membrane covering the brain within the skull. There was some evidence of injury to the outer surface of the brain, the cortex. Most significant, however, was the presence of brain swelling, which could not be accounted for so soon after the fight occurring only two hours before. The presence of this swelling could only be accounted for by an injury sometime prior thereto, such condition necessarily leading to the conclusion that Flores had this condition when he went into the fight with Donoghue which, in the light of good practice, the EEG and, from his own experience, Dr. Nardiello should within reasonable limits have anticipated. This is so, even though Flores did not show any objective symptoms at the time he was examined on August 29. All of the medical men agree that injury and damage could exist without such *419 symptoms. Dr. Nardiello knew from the record that Flores had suffered two TKOs in succession in less than a month’s time; that in each instance he had taken a severe beating to the head; both Dr. Swetnick and Dr. Bockner knew that it was good practice to lay off a fighter for a rest of from six to eight weeks. Dr. Nardiello knew it too. He had the records, the experience and the power to suspend, but, for some reason best known to himself, he did not go behind the prior examinations, but chose to limit his report to what he himself observed on August 29.
Under the circumstances, as Judge Young pointed out, “ Dr. Nardiello had a positive duty to report and act upon whatever his knowledge and experience told him were Flores’ disabilities, regardless of the time of their origin. We cannot conceive what would make Dr. Nardiello think that his examination was only limited to disabilities incurred since the last physical examination. We believe that Dr. Nardiello’s knowledge and experience told him that Flores had no right to be fighting on August 29th. No possible concept of his duty can excuse his failure to inform the State, if not Flores, of his judgment.” While nothing particularly turns on it, Flores’ fight record which is among the papers does throw light on the highly commercialized aspects of the fight game. It begins with a fight on March 2, 1950. Between then and December 23, 1950, he engaged in 15 other fights, an average of two fights a month. From January 13, 1951 to the fatal fight on August 29, he again fought eight times. He was 20 years of age, rugged and, no doubt, ambitious but even so he was being driven at a pretty fast pace, even for a fighter.
As trier of the fact, the Court of Claims was justified in finding that good medical practice demands a layoff for boxers who have suffered a knockout or a severe beating about the head from six weeks to two months; that, in face of such fact, it was negligent for Dr. Nardiello to certify Flores as fit to fight on August 29, 1951. This was not an error in judgment, as the Appellate Division has indicated, but was a failure to give proper heed and consideration to obvious medical facts and practices. The examination is primarily to make sure that the fighter is in good physical condition before entering the ring. Dr. Nardiello was fully cognizant of this responsibility, since he knew it was good practice to lay off six to eight weeks after a technical knockout and he freely admitted that he had the *420 authority to prevent Flores from appearing in the ring. His negligence was the negligence of the State. The State has complete and exclusive control of boxing matches. This fight could not have taken place without its approval. The State, having conferred upon its Athletic Commission broad and exclusive powers to regulate and conduct prize fights, it follows that any negligence in the performance of the duty thus imposed becomes the responsibility of the State.
I vote to. reverse the judgment appealed from and to reinstate that of the Court of Claims, with costs.
Judges Desmond, Fboessel and Van Voobhis concur with Judge Fuld ; Judge Dye dissents in an opinion in which Chief Judge Conway and Judge Bubke concur.
Judgment affirmed.